**M. FORTUNOFF OF WESTBURY CORP., Plaintiff–Appellee,**

v.

**PEERLESS INSURANCE COMPANY, a subsidiary of Liberty Mutual Group, Defendant–Appellant.**

**Docket No. 03–7408.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 23, 2004.

Final Amicus Brief Filed: Dec. 30, 2004.

Decided: Dec. 13, 2005.

Edward Farman, New York, New York (Schindel, Farman & Lipsius, LLP, New York, New York, of counsel), for Defendant–Appellant.

Raymond A. Selvaggio, Huntington, New York (Pezold, Smith, Hirschmann & Selvaggio, LLC, Huntington, New York, of counsel), for Plaintiff–Appellee.

Joseph G. Grasso, New York, New York (Jesse L. Snyder, Thacher Proffitt & Wood, LLP, New York, New York, of counsel), filed a brief for The Inland Marine Underwriters Association as Amicus Curiae.

George Carl Pezold, Huntington, New York, filed a letter brief for The Transportation Consumer Protection Council, Inc. as Amicus Curiae.

Peter V.K. Funk, Jr., Thompson Hine, LLP, New York, New York (Nicholas J. DiMichael, Jeffrey O. Moreno, Scott A. Harvey, Thompson Hine, LLP, Washington, D.C., of counsel), filed a letter brief for The National Industrial Transportation League as Amicus Curiae.

Prasad Sharma, American Trucking Associations, Inc., Alexandria, Virginia (Kenneth Siegel, Mark Andrews, Strasburger & Price, L.L.P., Washington, D.C., of counsel), filed a letter brief for the American Trucking Associations, Inc. as Amicus Curiae.

August E. Flentje, U.S. Department of Justice, Civil Division, Washington, D.C., filed a letter brief for The Federal Motor Carrier Safety Administration as Amicus Curiae.

Before: FEINBERG, CARDAMONE, and B.D. PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

We are presented with a simple set of facts on this appeal. A shipper's goods were damaged in transit, prompting it to make a claim against the carrier for its loss. When the carrier went out of business, the shipper asserted the same claim against the carrier's insurer. When the insurer denied liability, the shipper sued it. The shipper moved for summary judgment and the district court granted the motion. The insurer appeals from a judgment in favor of the shipper.

While the facts are simple, the statutory and regulatory context in which this case arises is complex and presents a question that is one of first impression in this and other circuits. That question is whether 49 U.S.C. § 13906(a)(3) (2000) (amended 2005), enacted as part of the Interstate Commerce Commission Termination Act of 1995 (ICCTA or Termination Act), Pub.L. No. 104–88, 109 Stat. 803, to replace the Motor Carrier Act's insurance provisions, allowed the Federal Motor Carrier Safety Administration (agency or FMCSA)—the

successor agency to the Interstate Commerce Commission (ICC) in this area of regulation—to continue to distinguish between types of motor carriage when requiring cargo liability insurance.

To put this problem in the form of an analogy, federal law, like a nautical chart, shows a safe passage to a harbor through ticklish waters. We are faced on this appeal with a situation where two parallel channels leading to the harbor were merged into one to provide a wider and more navigable trench through which all ships may travel. The Harbor Master (read Secretary of Transportation) nonetheless continued to require some ships to keep to the left channel and some to keep to the right channel during their passage. The question we must answer is whether it was permissible for the Harbor Master to continue to impose this requirement. We think it was, as the following discussion will show.

Numerous trucking and insurance industry trade groups participated as amici in this case. These groups included the Inland Marine Underwriters Association in support of the insurer, and the American Trucking Associations, Inc., National Industrial Transportation League, and Transportation Consumer Protection Council, Inc. in support of the shipper. The agency also filed an amicus brief that, although it does not expressly support either party, urges reversal of the district court's judgment and thus indirectly supports the insurance company appellant.

We hold that 49 U.S.C. § 13906(a)(3) gave the FMCSA discretion to require cargo liability insurance for some types of motor carriage and not others, and that the agency's discretion is entitled to deference. We therefore reverse the district court's grant of summary judgment in favor of the shipper and remand to the district court for further consideration consistent with this opinion.

## BACKGROUND

### A. Legislative and Regulatory Framework

#### 1. Brief History

Before analyzing the merits, it is necessary to establish the legislative and regulatory framework in which this appeal must be decided. After years of lobbying by railroads and state governments, and the eventual agreement of trucking trade groups, Congress enacted the Motor Carrier Act of 1935 (Motor Carrier Act or Act), ch. 498, 49 Stat. 543, amended by Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793, which extended the scope of the Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379, to cover motor transport. See Thomas Gale Moore, Unfinished Business in Motor Carrier Deregulation, Regulation, Summer 1991, at 49, 49–50. The Act gave the Interstate Commerce Commission authority, for the first time, to regulate the trucking industry comprehensively, see id. at 49, including the discretion to require that certain motor carriers carry cargo liability insurance to cover losses to shippers resulting from the damage or destruction of goods while in transit.

#### 2. The Motor Carrier Act Regime: Common Carriers and Contract Carriers

Prior to 1995 the Motor Carrier Act distinguished between two different types of motor carriers: motor common carriers and motor contract carriers. See 49 U.S.C. § 10102(15)-(16) (1994) (omitted 1995). "Generally, whether a carrier is common or contract is determined by the type of relationship it has with its customers and the type of authority it holds if its

operations are regulated." H.N. Cunningham III, *Transborder–Road Transportation*, 23 St. Mary's L.J. 801, 806 (1992).

Under this regime a common carrier held itself out to provide shipping services to the general public—usually unsophisticated shippers with little bargaining power—according to a schedule of fixed rates and with no negotiated contract. *Trans–Allied Audit Co., Inc. v. Interstate Commerce Comm'n*, 33 F.3d 1024, 1028 (8th Cir.1994) (*citing* 49 U.S.C. §§ 10102(14), 10761(a), 10762 (1988)). Common carriage ordinarily involved individual transactions occurring from time to time as need arose rather than as an ongoing course of business between the shipper and carrier. *See Transrisk Corp. v. Matsushita Elec. Corp. of Am.*, 15 F.3d 313, 316 (4th Cir.1994).

Contract carriers provided shipping services pursuant to bilateral contracts that were individually negotiated with more sophisticated shippers that bargained with the carrier at arm's length. *See Trans–Allied Audit Co.*, 33 F.3d at 1028–29. A contract carrier entered into an individualized, formal written agreement with a shipper that provided for ongoing shipping services either exclusively for the shipper's benefit or in satisfaction of the shipper's "distinct needs." *See* 49 U.S.C. § 10102(16) (1994) (omitted 1995); 49 C.F.R. § 1053.1 (1991). "It is the ongoing relationship, service commitment, and commercial link between a carrier and its shippers that render contract carriage inherently different from common carriage service alternatives." *C.H. Robinson Co.*, No. 40753, 1993 WL 375845 (I.C.C. Sept. 15, 1993)5.

Prior to 1995 each type of carrier received a separate registration issued by the ICC: common carriers obtained a certificate of public convenience and necessity under 49 U.S.C. § 10922 (repealed 1995), and contract carriers obtained a permit under 49 U.S.C. § 10923 (repealed 1995). One of the primary regulatory differences between the two types of carriers concerned insurance requirements. The insurance requirement at issue in this appeal arose from § 10927(a)(3) (repealed 1995), which read

> The [Interstate Commerce] Commission may require a motor *common carrier* ... to file with the Commission a type of security sufficient to pay a shipper or consignee for damage to property of the shipper or consignee placed in the possession of the motor *common carrier* as the result of transportation provided under this subtitle [emphases added].

Acting under the authority granted by this section of the Motor Carrier Act, the ICC promulgated regulations in 1982 requiring that all common carriers provide security to compensate shippers "(1) for loss of or damage to property carried on any one motor vehicle—$5,000, [and] (2) for loss of or damage to or aggregate of losses or damages of or to property occurring at any one time and place—$10,000." 49 C.F.R. § 1043.2(c) (1994).

This mandatory minimum cargo insurance became known as BMC–32 coverage. As a means of facilitating the statutory requirement and the ICC regulation, the Bureau of Motor Carriers (a division of the ICC) issued a standard form known as the "BMC–32 endorsement" as a mandatory attachment to all common carrier insurance policies. The BMC–32 endorsement applied only to common carriers pursuant to § 10927(a)(3) and 49 C.F.R. § 1043.2(c) and provided, in relevant part

> The policy to which this endorsement is attached is a cargo insurance policy, and is hereby amended to assure compliance by the insured, as a common carrier of property by motor vehicle, with Section 215 of the Interstate Commerce Act, ... [in] its transportation service

under certificate of public convenience and necessity issued to the insured by the Interstate Commerce Commission, or otherwise in transportation in interstate or foreign commerce.

... [T]he [insurer] hereby agrees to pay, within the limits of liability hereinafter provided, any shipper or consignee for all loss of or damage to all property belonging to such shipper or consignee, and coming into the possession of the insured in connection with such transportation service, for which loss or damage the insured may be held legally liable.

The BMC–32 endorsement form reprinted the liability limits contained in 49 C.F.R. § 1043.2(c).

Interestingly, many trucking companies obtained both a common carrier certificate and a contract carrier permit, meaning they were authorized to operate as either type of carrier. The choice of authority under which any given transportation was conducted depended on the type of service offered to the shipper. If the carrier agreed to transport a shipper's goods according to standard terms and at a fixed rate (i.e., without an individually negotiated contract) on a non-recurring basis, then the transportation was conducted under the carrier's common carrier certificate. Accordingly, common carrier rules, including the cargo liability insurance and the BMC–32 endorsement requirement, applied. Alternatively, if the carrier and the shipper wished to negotiate a bilateral contract for an ongoing course of shipping services, the carrier was required to operate under its contract carrier permit, and no cargo insurance was necessary.

The different insurance requirements for common and contract carriers made economic sense. As the FMCSA explained in its amicus brief, shippers employing the services of a contract carrier were usually experienced business people who negotiate a contract with the carrier to ship large quantities of goods on a regular basis, whereas customers seeking the services of a common carrier were usually less experienced in transporting goods and more in need of default insurance protection.

Accordingly, a sophisticated shipper using contract carriage could provide for insurance by contract if it wished—either supplying more insurance than provided by the common carrier provisions of former § 10927(a)(3) and 49 C.F.R. § 1043.2(c) or rejecting insurance if it was more cost effective for the shipper to self-insure. The smaller shippers who usually employed common carriage had no opportunity to contract individually for their needs, and the insurance requirements set forth in 49 C.F.R. § 1043.2(c) and reprinted in the BMC–32 endorsement provided a reasonable safety net for the potential loss a small shipper using that type of carriage might incur.

### 3. The ICCTA Abolishes the Distinction Between the Two Types of Carriers

Congress enacted the ICCTA in 1995 and merged the separate classifications of common and contract carrier into one classification termed "motor carrier," governing any "person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12) (2000). The ICCTA provided that *all* motor carriers were to register under § 13902(a) (2000), as opposed to the old regime of separately registered common and contract carriers.[1]

---

1. Congress once again amended the statute effective August 10, 2005. *See* Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub.L. No. 109–59, 119 Stat. 1144 (2005). The new statute includes additional registration requirements for household

Under § 14101 (2000), registered motor carriers *must* provide common carriage services and *may* provide contract carriage services.

With respect to cargo liability insurance, the ICCTA replaced § 10927(a)(3) with § 13906(a)(3) (2000), which provided

> The Secretary [of Transportation] may require a registered *motor carrier* to file with the Secretary a type of security sufficient to pay a shipper or consignee for damage to property of the shipper or consignee placed in the possession of the *motor carrier* as the result of transportation provided under this part [emphases added].

The only salient differences between this section and the former § 10927(a)(3) was the substitution of the Secretary of Transportation for the ICC and the change from "motor common carrier" to "motor carrier."

The Secretary of Transportation delegated the authority to require filings of security for payment to the FMCSA. *See* 49 C.F.R. § 1.73(a)(5) (2004). That agency, acting pursuant to the so-called "transition rule" in 49 U.S.C. § 13902(d) (2000), continued to register transportation providers as "common carriers" and "contract carriers" pending the completion of rulemaking that fully implements § 13902(a). As of the oral argument in this appeal, the agency continued to register common carriers and contract carriers separately, despite the fact that the authority to do so under the transition rule had expired on January 1, 1998. *See* 49 U.S.C. § 13908(e) (2000) (stating that the Secretary "shall conclude the rulemaking under this section" no later than "24 months after January 1, 1996"). After this appeal was taken, Congress provided new authority for the Secretary to promulgate rules, *see* 49 U.S.C. § 13902(f) (2005). This does not change the fact that the Secretary was acting without authority between January 1, 1998 and August 9, 2005.

The FMCSA continues to distinguish between common and contract carriers for purposes of requiring cargo liability insurance. Following passage of the Termination Act, the agency replaced 49 C.F.R. § 1043.2(c) with 49 C.F.R. §§ 387.301(b) and 387.303(c) (2004). Section 387.301(b) states

> No *common carrier* . . . shall engage in interstate or foreign commerce, nor shall any certificate be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the [agency], a surety bond, certificate of insurance, proof of qualifications as a self-insurer, or other securities or agreements in the amounts prescribed in § 387.303 [emphasis added].

Section 387.303(c) prescribes the amounts referred to in § 387.301(b). It states

> *Motor common carriers: Cargo liability.* Security required to compensate shippers or consignees for loss or damage to property belonging to shippers or consignees and coming into the possession of *motor carriers* in connection with their transportation service, (1) for loss of or damage to property carried on any one motor vehicle—$5,000, (2) for less [*sic*] of or damage to or aggregate of losses or damages of or to property occurring at any one time and place—$10,000 [second emphasis added].

goods motor carriers, *see* 49 U.S.C. § 13902(a)(2) (2005), and makes other amendments to the motor carrier statutory scheme. This new version of the statute is not before us on appeal. Accordingly, except where explicitly noted, all references to 49 U.S.C. §§ 13102, 13902, and 13906 are to the version of the statute as amended by the ICCTA and do not include changes made on August 10, 2005.

Thus, the insurance requirement in § 387.301(b) applies to "common carriers," while the limitation amounts on that insurance are applied to "motor carriers" in a section titled "Motor common carriers."

We discuss this ambiguity in detail below. Presently, however, we note that the language in § 387.303(c), including the reference to motor carriers, is the same as that found in the pre-ICCTA regulation that applied only to common carriers. *Compare* 49 C.F.R. § 1043.2(c) (1994), *with* 49 C.F.R. § 387.303(c) (2004). Moreover, the agency, in its registration requirements and its amicus brief, interpreted these regulations to preserve the functional distinction between common carriage and contract carriage regarding cargo liability insurance requirements. *See, e.g.,* Federal Motor Carrier Safety Administration, FMCSA Registration Requirements, http://www.fmc sa.dot.gov/registration-licensing /licensing/ registr.htm (last visited Nov. 14, 2005) ("*Selecting 'Common' or 'Contract'*: ... the [ICCTA] specifically authorizes [the agency] to continue registering applicants as either common or contract carriers. The current principal distinction between the two types is that common carrier applicants must file proof of cargo insurance while contract carrier applicants are not required to do so."). The agency also retained the pre-ICCTA BMC–32 endorsement form, which by its terms applied only to common carriers.

## B. *Facts*

With this background in mind, we briefly set out the facts recited earlier in more detail. The shipper, M. Fortunoff of Westbury Corp. (Fortunoff or plaintiff), is a registered New York corporation that operates a chain of department and speciality stores in New York and New Jersey. In March 1997 it entered into a Transportation Service Agreement with Frederickson Motor Express Corporation (Frederickson), a trucking company engaged in the interstate transport of freight. As is the case of many other motor carriers, Frederickson had both a common carrier certificate and a contract carrier permit, and was thus authorized to offer both common and contract carriage services.

Pursuant to the Transportation Service Agreement, the carrier agreed

> as contract carrier and independent contractor, and not as an agent or employee of shipper [Fortunoff], to transport shipments between points in the Carrier's Direct Service Area as authorized in CARRIER'S contract carrier permit, MC–28307, Sub 34B, issued by the Interstate Commerce Commission.

The agreement further provided

> Although CARRIER is authorized to operate, and does operate, as a common carrier, each and every shipment tendered to CARRIER by SHIPPER on or after the date of this AGREEMENT shall be deemed to be a tender to CARRIER as a motor contract carrier and shall be subject only to the terms of this AGREEMENT and the provisions of law applicable to motor contract carriage hereunder.

Regarding insurance and risk of loss, the contract stated: "CARRIER will keep in force and effect insurance policies in amounts required by the ICC for common carriers" and "CARRIER shall be liable to SHIPPER for cargo loss or damage as a common carrier."

On August 23, 1993, prior to the enactment of the ICCTA, Frederickson purchased a cargo insurance policy from Peerless Insurance Company (Peerless or appellant), a wholly owned subsidiary of Liberty Mutual Group, Inc. As required by the ICC, a BMC–32 endorsement was

included as part of the policy, covering Frederickson "as a common carrier of property by motor vehicle." This policy was in force at the time Fortunoff and Frederickson executed the Transportation Service Agreement in March 1997 and remained in force through March 13, 1998. During this time, Fortunoff filed 62 separate claims for goods lost or damaged during transport by Frederickson. Each of these claims was for less than $5,000, and together totaled $13,249.42.

The carrier became insolvent and ceased operations in January 1998. In March 2001, Fortunoff filed a claim with Peerless for the $13,249.42 in lost and damaged goods and sought payment under the BMC–32 endorsement to the carrier's insurance policy. Peerless denied coverage.

## C. *Prior Legal Proceedings*

As a result of the denial, Fortunoff brought the instant suit against Peerless in the United States District Court for the Eastern District of New York (Seybert, J.) on June 1, 2001. *See M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.,* 260 F.Supp.2d 524, 525 (E.D.N.Y.2003). Both parties moved for summary judgment. Peerless sought summary judgment on the ground that the carrier and the shipper concluded the Transportation Service Agreement under Frederickson's permit as a contract carrier, and the BMC–32 endorsement was restricted to Frederickson's liability when acting as a common carrier. *Id.* at 526–27. Fortunoff sought summary judgment on the grounds that the ICCTA abolished the distinction between common and contract carriers, thus making both categories subject to the same insurance requirements and extending BMC–32 endorsements to all carriers; or, in the alternative, that Frederickson explicitly accepted common carrier liability in the Transportation Service Agreement,

even though actual performance of the agreement was under its contract carrier permit. *See id.* at 527.

The district court granted summary judgment for Fortunoff on the first ground and thus did not reach the contractual issue. *Id.* at 529–30. It held that the plain meaning of the ICCTA as well as its legislative history indicated that Congress sought to abolish the distinction between common and contract carriers. *Id.* at 527–28. Since the agreement between the carrier and the shipper was executed and performed after the passage of the ICCTA, the district court concluded the carrier was "a motor carrier providing contract carriage services." *Id.* at 528. It explained that it "must presume that Congress knew how the previous laws were applied and that any changes in the language of the new law were intended." *Id.* The court ruled therefore, that in replacing 49 U.S.C. § 10927(a)(3) (which empowered the ICC to require only common carriers to have cargo liability insurance) with 49 U.S.C. § 13906(a)(3) (which empowers the Secretary of Transportation to require motor carriers to have cargo liability insurance), Congress required the BMC–32 endorsement formerly applicable only to common carriers to be applied to all motor carriers. *M. Fortunoff of Westbury Corp.,* 260 F.Supp.2d at 528–29. On this basis, the district court held that the BMC–32 endorsement now necessarily applies to all motor carriers, regardless of their previous classification as a common or contract carrier. *Id.* at 529. It thus awarded plaintiff $13,249.42 in damages, from which award Peerless appeals. We now reverse.

## DISCUSSION

Peerless raises one issue on appeal: Did the ICCTA require that existing BMC–32 endorsements be expanded to require that all motor carriers have cargo liability in-

surance regardless of the function performed? We agree with appellant that the ICCTA did not mandate such insurance for all functions performed by all motor carriers. Rather, the law gave the FMCSA discretion to require some motor carriers to carry insurance while others need not. Further, we think the agency properly exercised that discretion in distinguishing between common and contract carriage services when requiring cargo liability insurance, and we believe this distinction is entitled to deference.

I The Meaning of 49 U.S.C. § 13906(a)(3)

A. *Congress Abolished the Distinction Between Common and Contract Carriers*

■ In enacting the Termination Act, Congress sought to eliminate the separate licensing requirements for common and contract carriers. In § 13102(12) it defined only one class of motor transport carrier—the motor carrier—thus replacing the Motor Carrier Act's distinction between common and contract carriers, neither of which is defined in the ICCTA. Moreover, the registration provision in § 13902(a) provided only for the registration of "motor carrier[s]," replacing the bifurcated registration regime discussed earlier that existed under the Motor Carrier Act. *See* 49 U.S.C. § 10922 (1994) (registration of common carriers); *id.* § 10923 (1994) (registration of contract carriers). When Congress amends a statute we presume that it intends changes to occur. *United States v. Wilson,* 503 U.S. 329, 336, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). We can therefore safely conclude that in enacting the ICCTA, Congress envisioned the elimination of separate categories for

motor carriers. *Cf. Whitaker v. Frito-Lay, Inc. (In re Olympia Holding Corp.),* 88 F.3d 952, 955 n. 4 (11th Cir.1996) ("[T]he distinction between common and contract carriers is no longer meaningful. The terms ... have therefore been deleted by the ICC Termination Act.").

The legislative history supports this conclusion. The Senate Commerce Committee reported that "[t]he bill would eliminate the regulatorily-created distinction between common and contract motor carriers.[2] Such categorizations have lost their meaning, because most carriers now operate in a dual capacity. Under the bill, all motor carriers would have a common carrier obligation, but would be free to contract for individual shipments." S.Rep. No. 104–176 (1995), 1995 WL 701522, at *10; *cf.* H.R.Rep. No. 104–311 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 831 ("The Committee does not intend, through the elimination of the distinction between common and contract carriage, to extend financial reporting to those carriers that are currently exempt through this technical change in definition.").

■ Although the Secretary had temporary authority under the ICCTA's transition rule to continue registering common carriers and contract carriers "[p]ending the implementation of the rulemaking required by section 13908," 49 U.S.C. § 13902(d) (2000), this authority had expired in 1998. *See* 49 U.S.C. § 13908(e) (2000). The agency exceeded the temporary allowance contained in the transition rule by seven years, and therefore we accord no weight or deference to the agency's action purportedly taken under that rule. The transition rule offered no authority for the continued registration of common and contract carriers,[3] and there-

---

**2.** We note that the distinction was not, in fact, created by regulation, but was explicit in the terms of 49 U.S.C. §§ 10102(15) and 10102(16) (1994).

**3.** We further note the FMCSA represented to

fore holders of common carrier certificates and contract carrier permits at the time this case arose were simply motor carriers as that term was defined in § 13102(12).

### B. The Secretary of Transportation Has Discretion Over Cargo Liability Insurance

■ Although Congress' aim was to eliminate the separate registration requirements for common and contract carriers, we do not believe that fact is dispositive in this case. Rather, what is most important is the method by which Congress saw fit to implement the Termination Act. With respect to insurance, Congress left it to the Secretary of Transportation's discretion to require cargo liability insurance. As we have stated, § 13906(a)(3) replaced former § 10927(a)(3) and gave the Secretary discretion over whether "a registered motor carrier," including carriers once classified as common or contract, must insure cargo.

The district court relied on *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), for two propositions: (1) "[w]hen construing a new law that amends or changes an old law, the Court must presume that Congress knew how the previous laws were applied and that any changes in the language of the new law were intended"; and (2) "when Congress 're-enacts a statute without change,' it is presumed that Congress was aware of the interpretations and applications of the law and intended not to disturb it." *M. Fortunoff of Westbury Corp.*, 260 F.Supp.2d at 528 (*citing Lorillard*, 434 U.S. at 581, 98 S.Ct. 866). Reasoning from these principles, the district court decided

that in changing "motor common carrier" in § 10927(a)(3) to "motor carrier" in § 13906(a)(3), Congress ratified the ICC's prior discretionary requirement that common carriers have cargo liability insurance and imposed this requirement on all motor carriers, absent action by the Secretary of Transportation to cancel the insurance requirement altogether. *See id.* at 528–29, 98 S.Ct. 866.

We have difficulty accepting that proposition because Congress, in replacing § 10927(a)(3) with § 13906(a)(3), was not faced with a binding construction by a court or agency finding that § 10927(a)(3) *required* any motor carriers to have cargo liability insurance. Such an authoritative interpretation by a court or agency has been required in cases in which these rules of statutory construction relied on by the district court have been used. *See Lorillard*, 434 U.S. at 580–81, 98 S.Ct. 866 (holding that Congress' incorporation of jury provisions of the Fair Labor Standards Act into the Age Discrimination in Employment Act necessarily ratified and adopted longstanding judicial construction of those provisions); *see also United States v. Bd. of Comm'rs*, 435 U.S. 110, 131, 134–35, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978) (holding when Congress re-enacted the Voting Rights Act, it necessarily adopted Justice Department's longstanding interpretation of Act's requirements); *Shapiro v. United States*, 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (holding that when Congress included provisions of Compulsory Testimony Act of 1893 in the Emergency Price Control Act

this Court, in its amicus brief, that it expected to promulgate the required rules in February 2005. On May 19, 2005, the agency published a notice of proposed rulemaking regarding the long overdue regulations that were mandated by the ICCTA in 1995. Comments were

due to the agency by August 17, 2005. In the meantime Congress changed the statute and provided new rulemaking authority for FMCSA, *see* 49 U.S.C. § 13908(a) (2005). As of this writing the agency has not promulgated these rules.

of 1942, it necessarily adopted "settled judicial construction" of the 1893 Act).

The only ICC interpretation of the Motor Carrier Act's cargo liability insurance provisions that Congress could be deemed to have accepted and incorporated was the ICC's implicit (and correct) conclusion that § 10927(a)(3) gave it discretion to require a common carrier to have cargo liability insurance. In other words, when Congress replaced § 10927(a)(3) with § 13906(a)(3), there was no pre-existing judicial or agency interpretation of what the law *required*. The plain language of § 10927(a)(3) did not *require* any carrier to have cargo liability insurance, but merely gave the ICC *discretion* to decide which carriers should have insurance, and the ICC exercised this discretion. We need not decide whether Congress can be deemed to have adopted the ICC's implicit interpretation of § 10927(a)(3), however, because Congress expressly incorporated such discretion in § 13906(a)(3).

Consequently, we hold that § 13906(a)(3) (2000), under which the Secretary "*may* require *a registered motor carrier,*" 49 U.S.C. § 13906(a)(3) (emphases added), to have cargo insurance, gave the Secretary (and the FMCSA as the Secretary's delegate) broad discretion to choose among motor carriers and require that some carry insurance while others need not. The statute did not state that the Secretary *must* require insurance, nor does it identify the object of the Secretary's discretion as motor carriers as a group. Rather, by subjecting a registered motor carrier to the Secretary's discretion individually, the statute gave the Secretary discretion to require cargo liability insurance on a case-by-case basis and to develop rules regarding which motor carriers are required to have insurance and which are not.

## II The Meaning of the Governing Regulations

### A. *Standard of Review*

 Because the FMCSA was acting outside of the ICCTA's rulemaking authority that expired on January 1, 1998, we cannot give *Chevron* deference to the agency's ruling. *See Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). Instead, the agency's interpretation is "entitled to respect" under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), "to the extent that th[e] interpretation[ ] ha[s] the power to persuade." *Christensen,* 529 U.S. at 586–87, 120 S.Ct. 1655.

Due to "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgate[d] its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments," *Community Health Ctr. v. Wilson–Coker,* 311 F.3d 132, 138 (2d Cir.2002), we think the FMCSA's interpretation is entitled to deference. Although the agency's regulatory position is somewhat anomalous—due in large part to its piecemeal revision of the ICC's old regulations and its failure to promulgate a new body of rules in a timely fashion—we conclude that it requires motor carriers to have cargo liability insurance when they perform common carriage functions, but not when they perform contract carriage

functions, and that this decision is entitled to respect because it is persuasive.

### B. *49 C.F.R. §§ 387.301(b) and 387.303(c)*

The FMCSA's discretionary cargo liability requirements are found in two regulations: 49 C.F.R. §§ 387.301(b) and 387.303(c). Section 387.301(b) states that *common carriers* must "file[ ] with ... the [agency], a surety bond, certificate of insurance, or proof of qualifications as a self-insurer, or other securities or agreements in the amounts prescribed in § 387.303." Section 387.303(c), quoted at length above, sets forth the amounts of cargo liability insurance required under § 387.301(b). Section 387.303(c) is headed "Motor common carriers" but refers in the text of the regulation to "motor carriers." The language in that section, including the reference to motor carriers, predates the passage of the ICCTA. *See* 49 C.F.R. § 1043.2(c) (1994) (using same language as § 387.303(c)).

▆▆▆ The agency's interpretation of its own rules and regulations provided to this Court by the agency in an amicus brief is also entitled to some deference from us. *See Community Health Ctr.*, 311 F.3d at 137 n. 8 (citing *Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)). In that amicus brief, the agency interprets its cargo liability regulations to apply to common carriers only and argues that its distinction based on separate licensing requirements for common and contract carriers is valid under the § 13902(d) transition rule. To the extent that the amicus brief is interpreting·the agency's own regulations, as it is here, it is entitled to deference under *Auer*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79, as long as the regulation is ambiguous—which we have observed it is. However, this deference does not extend to the portions of the amicus brief that present the agency's interpretation of the ICCTA. *See Christensen*, 529 U.S. at 588, 120 S.Ct. 1655 ("In *Auer*, we held that an agency's interpretation of its own regulation is entitled to deference. But *Auer* deference is warranted only when the language of the regulation is ambiguous."). To the extent that the FMCSA's brief interprets the ICCTA, it is only entitled to *Skidmore* deference as set out in *Christensen* and *Mead*.

We have already commented that the authority conferred on the agency by the transition rule expired seven years ago. Thus, we are wholly unpersuaded that the FMCSA could lawfully continue to register common and contract carriers under separate licensing regimes. Rather, all carriers were motor carriers under the ICCTA, and the agency's formal designation of certain carriers as common and others as contract was therefore without effect.

This does not mean, however, that the *functional* differences between the two types of carriage are irrelevant to the exercise of the agency's discretion to require cargo liability insurance. Congress' creation of one type of motor carrier did not also create only one type of carriage. Indeed, common carriage services, that is, those services offered to the general public at fixed rates without negotiated bilateral contracts, continue to be different from contract carriage services, which are those services performed on an ongoing basis for a shipper pursuant to a contract individually negotiated at arm's length. This fundamental distinction remains explicit in the terms of the Termination Act. *See* 49 U.S.C. § 14101 (2000) (requiring motor carriers to perform common carrier services and permitting them to perform contract carrier services).

As is clear from the above discussion, requiring cargo liability insurance for com-

mon carriage but not contract carriage is not an arbitrary distinction. Instead, it makes economic sense because of the different types of services performed, and the customers served, by common carriage. Although the licensing distinction between common and contract carriers was abolished by the ICCTA, such occurred in large part because most carriers had a common carrier certificate and a contract carrier permit and provided both types of services anyway. But the functional distinction between the two types of carriage survives, and is still highly relevant to deciding which motor carriers must have cargo liability insurance.

The agency, in its amicus brief, relied heavily on these functional differences in justifying its decision to continue registering common carriers and contract carriers under § 13902(d) ICCTA's transition rule and requiring cargo liability insurance only for common carriers. Although the transition rule no longer provided authority for the separate *registration* of common and contract carriers, this did not prevent the FMCSA from differentiating between the two types of *services* when requiring cargo liability insurance, and the agency's brief convinces us this was its intent.

The discretion granted the Secretary by § 13906(a)(3) was not so limited as to require the agency to impose cargo liability insurance on *all* of a motor carrier's functions if it wished to impose cargo liability insurance on some of them. It was consistent with the Termination Act and, specifically, the terms of § 13906(a)(3) for the FMCSA to take into account the different services a motor carrier performs in choosing the appropriate cargo liability insurance requirements for that carrier, especially since those differences (and the different customers served thereby) are the primary reason there is not a univer-

sal, across-the-board cargo liability insurance requirement.

### C. *The BMC–32 Endorsement*

In its amicus brief, the American Trucking Associations (ATA) contended the agency's regulations were not dispositive. It argued that the language of the BMC–32 endorsement, even pre-ICCTA, applied to all forms of carriage performed by a common carrier, including contract carriage if the common carrier also had a contract carrier permit. In particular, the ATA relied on language in the BMC–32 endorsement form that covered "transportation service under [a common carrier's] certificate of public convenience and necessity issued to the insured by the Interstate Commerce Commission, *or otherwise in transportation* in interstate or foreign commerce" (emphasis added). The ATA maintained that the "otherwise in transportation" language must have referred to the contract carrier functions performed by a company that had both a common carrier certificate and a contract carrier permit. Since the ICCTA required all motor carriers to perform common carrier services, *see* 49 U.S.C. § 14101 (2000), and the agency had not revised the BMC–32 endorsement form, the ATA concluded that the BMC–32 endorsement applied to all transportation performed by all motor carriers, regardless of whether the transportation was pursuant to an individually negotiated contract and regardless of the governing regulations.

We cannot agree. The Bureau of Motor Carriers created the BMC–32 endorsement pursuant to the ICC's exercise of discretionary authority under 49 U.S.C. § 10927(a)(3) to require cargo liability insurance of *common carriers only*. Congress deliberately denied the ICC authority to require such insurance for contract carriers, and any rule that sought to im-

pose cargo liability insurance on a carrier's contractual operations simply because that carrier also operated, in part, under a common carrier certificate would not only have been unreasonable, but also "out of harmony with the statute [and thus] a mere nullity." *Manhattan Gen. Equip. Co. v. Com'r*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). In *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), for example, the Supreme Court held that the ICC lacked authority to exempt common carriers from the filed rate requirement because "Congress had allowed the Commission to exempt motor *contract* carriers from the [filed rate] requirement, [but] deliberately chose[ ] not to disturb it with respect to motor *common* carriers," and an agency may not "adopt a policy that directly conflicts with its governing statute." *Id.* at 134–35, 56 S.Ct. 397. The situation in the present case is similar.

Such a requirement would also have been absurd from the customers' perspective, because it makes little sense to force default cargo liability insurance on sophisticated consumers of contract carriage—who may or may not have wanted the insurance, and who the law expressly exempted from the ICC's discretionary power to require such insurance—simply because the contract carrier also performed common carrier functions for other customers. Indeed, carriers chose to operate under their contract carrier permits rather than their common carrier certificates *because* this allowed them to negotiate individual transportation agreements with shippers and avoid one-size-fits-all common carrier requirements, including fixed rates and prescribed levels of cargo liability insurance.

Moreover, we have been unable to locate any case, and the ATA cites none, in which the ICC directly applied common carrier cargo liability requirements to operations conducted under a company's contract carrier permit. And, of even greater relevance for our purposes, the FMCSA did not interpret the BMC–32 endorsement to apply to both common and contract carriage services. Rather, as explained above, it went out of its way to *retain* the distinction between common and contract carriage in its cargo liability insurance requirements, and stated in its amicus brief that the language of the BMC–32 endorsement "is designed to be coextensive with the regulatory requirements." Hence, the ATA's interpretation of the BMC–32 endorsement is contrary to the FMCSA's aim, and is in our view without merit.

 In sum, we hold that the FMCSA's discretionary decision to require motor carriers to supply default cargo liability insurance only when performing common carriage services is consistent with the terms of the ICCTA, and the agency's decision is entitled to respect. As a consequence of this ruling we must reverse the district court's judgment in favor of plaintiff Fortunoff.

### III Considerations on Remand

Fortunoff has consistently maintained an alternative ground for summary judgment in its favor, *see M. Fortunoff of Westbury Corp.*, 260 F.Supp.2d at 527, and in its brief on appeal. It declares that Frederickson agreed in the Transportation Service Agreement to be liable as a common carrier, even though Frederickson provided transport services to Fortunoff under its contract carrier permit. Peerless contests this, arguing that common carriage insurance requirements may only attach to common carriage services, and that Fortunoff and Frederickson cannot impose obligations on Peerless by agreeing—between themselves and without Peerless' consent—that Frederickson's

cargo liability coverage applies to services otherwise outside the scope of the insurance policy.

The district court granted summary judgment for Fortunoff solely on the ground that the ICCTA mandated the extension of BMC–32 endorsements to all motor carriers, regardless of the Secretary of Transportation's discretionary decision not to do so. This judgment, as just discussed, is an error of law which we reverse. The district court did not consider the terms of the Transportation Service Agreement and made no factual findings as to its meaning and the intent of the parties. We must therefore remand to the trial court to consider the terms of the Transportation Service Agreement between the shipper and the carrier.

In its amicus brief, the National Industrial Transportation League (NITL) advances yet another argument for judgment in Fortunoff's favor. The NITL asserts the insurance policy between Peerless and the carrier is ambiguous because the BMC–32 endorsement contains references to outmoded statutory language (such as "common carrier" and the now-defunct Interstate Commerce Commission). The NITL concludes that "the inconsistency between the wording of the policy and the statute presents ambiguities regarding Peerless' coverage obligations," and invites us to apply the doctrine of *contra proferentum* to interpret the ambiguities against the drafter of the contract and in favor of coverage for the shipper. *See, e.g., Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.,* 189 F.3d 208, 215 (2d Cir. 1999) (stating that an ambiguous insurance policy should be "construed in favor of coverage and against the insurer, because as the drafter of the policy the insurer is responsible for the ambiguity").

▮ We express no opinion on whether the BMC–32 endorsement's reference to outmoded statutory language creates ambiguity that should be interpreted against Peerless and in favor of coverage. It is familiar law that "courts should not resort to *contra proferentum* until after consideration of extrinsic evidence" to determine the parties' intent. *Id.* Since the district court did not admit any extrinsic evidence regarding the parties' intent under the insurance policy, but rather rested its decision solely on its interpretation of the ICCTA's requirements, we are not in a position to consider the issue on this appeal. Rather, the meaning of the insurance policy, like the meaning of the Transportation Service Agreement, should appropriately be addressed by the district court in the first instance.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed. The case is remanded for further consideration not inconsistent with this opinion.

Reversed and remanded.